**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAROLE J. BARRESE and** | ) | |
| **ROBERT G. BARRESE SR.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 1:19-cv-186-SPB** |
| **v.** | ) | |
| | ) | |
| **SCOTT'S EXPRESS PEACH, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Carole J. Barrese and her husband, Robert G. Barrese, Sr., filed this premises liability action against Defendant Scott's Express Peach, Inc. based upon personal injuries that Carole sustained after tripping and falling on the premises of the Defendant's hotel.  The Court's subject matter jurisdiction is predicated upon 28 U.S.C. §1332, as the parties have diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

Pending before the Court is Defendant's motion for summary judgment and Plaintiffs' counter-motion for sanctions.  For the reasons that follow, Defendant's motion will be granted and the Plaintiffs' motion will be denied.

1

# I.      Factual and Procedural Background[1]

### A.   Factual Background

Defendant Scott's Express Peach, Inc. operates a Holiday Inn Express hotel located on Peach Street in the City of Erie (at times hereafter, the "Holiday Inn" or the "hotel").  ECF No. 24, ¶4.  Carole and Robert Barrese are citizens of New York State who travel to Erie on occasion in connection with Robert's job responsibilities.  (C. Barrese Depo. at 24.)

On October 17, 2018, Plaintiffs traveled to Erie with the intent of staying at the Holiday Inn for two nights while Robert visited various company stores in the surrounding area.  (C. Barrese Depo. at 23-24.)  After dropping Robert off at one of the stores, Carole Barrese proceeded to the Holiday Inn to check in to the couple's room. ECF No. 24, ¶2.  Carole was familiar with the hotel, as the couple had stayed there "many times" before.  (C. Barrese Depo. at 27.)

In the foyer of the hotel is a decorative rug that is set within a metal frame. ECF No. 24, ¶2. The decorative rug sits lower than the surrounding tile area.  Id. Two weather mats sit atop the decorative rug and tile.  Id.

Upon arriving at the hotel, Carole entered the foyer area to retrieve a luggage cart, then returned to her car and loaded the luggage from her car onto the cart.  (C. Barrese Depo. at 24-27.)  She then passed through the foyer area again to enter the hotel with the luggage cart.  (Id.)

---

[1] The factual background is derived, in part, from the Defendant's Concise Statement of Undisputed Material Facts and Plaintiffs' responses thereto, ECF No. 24, as well as the Plaintiffs' Additional Statement of Facts and Defendant's responses thereto, ECF No. 25.  The Court also cites directly to portions of the record, especially the depositions of:  Carole J. Barrese, ECF Nos. 22-1 and 23-3; Danya Sotter, ECF Nos. 23-4 and 25-1; Stephen Windsor, ECF Nos. 22-2, 23-5, and 25-4; Raquel Smith, ECF Nos. 23-6 and 25-3; and Dwayne Byes, ECF Nos. 22-4, 23-8, and 25-2.

Once inside the hotel, she checked in at the front desk and went up to her room.  (Id.)  After

unloading her luggage in the room, Carole went back to the lobby to return the cart and leave the

hotel.  (Id.)   As she went back through the foyer area, she returned the luggage cart, turned to

leave, and fell, sustaining injuries to her knee.  (Id. at 24, 27, 32, 34.)  Plaintiffs theorize that the

"toe part" of Carole's left foot got "trapped" under one of the weather mats.  Id. at 32.  Although

she took no pictures at the time of her fall, Carole did take photographs of the area the following

day, at which time she documented one of the weather mats in a "buckled" state.  (Id. at 35.)

     *B. Commencement of Litigation and Discovery*

     This lawsuit ensued, with the filing of Plaintiffs' complaint on July 2, 2019.  In their

pleading, Carole alleges a single count of premises liability/negligence, and Robert alleges a

single count of loss of consortium.

     During the discovery process, the parties took depositions of the Plaintiffs as well as

various hotel employees.  Relevant aspects of the evidentiary record are set forth below.

     1. <u>Danya Sotter</u>

     Danya Sotter is the general manager of the Holiday Inn and was not present at the hotel

on the day of Carole Barrese's trip and fall.  At her deposition, she testified about the condition

and maintenance of the weather mats (sometimes referred to as weather "rugs") in the foyer area

of the hotel.

     Sotter testified that a company known as "Cintas" replaces the weather mats on a weekly

basis.  (Sotter Depo. at 20-21.)  In the interim, the hotel's "housemen" are responsible for

cleaning the mats on a daily basis and ensuring they are property situated.  (Id. at 21, 26.)  The

housemen generally perform three checks of the foyer area during the first shift (between

3

approximately 8:00 a.m. and 2:00 p.m.) and two more checks during the second shift.  (Id. at 26-27, 46.)  Although the front desk workers are not expected to leave their areas in order to attend to the foyer, they also know enough to fix the mats when necessary.  (Id. at 29, 46.)  To that end, Sotter testified:  "We all keep an eye on [the area]" to monitor "if [the mats] are crooked or anything.  If somebody notices it, they will fix it."  (Id. at 21:8-11.)  As part of her job responsibilities, she performs a walk-through visual inspection of the entire hotel five times per week. (Id. at 45.)

Sotter admitted in her deposition that she has observed the mats "bunched up" (meaning "buckled") at times, either from carts being pushed on them or "if someone is walking, they will kick it or something."  (Sotter Depo. at 21-23; id. at 42-44.)  When she notices this condition, she repositions the mats.  (Id. at 22.)  Although Sotter denied ever seeing anyone trip or stumble on the mats (id. at 22), she acknowledged that it would be a dangerous condition if the foyer mats are not laid flat.  (Id. at 47.)  She has therefore moved or fixed mats in the foyer area if the mat was bunched up to prevent others from tripping.  (Id. at 29.)

### 2.  Racquel Smith

Racquel Smith is a hotel staff member who works behind the front desk.  Her job duties include checking the lobby area for cleanliness.  (Smith Depo. at 12, 14.)  Smith stated that, if she observed a "visual issue," she would call upon the housemen, who are responsible for handling the lobby and general areas of the hotel.  (Id. at 12-14.)

With regard to the weather mats in the hotel foyer, Smith testified that she could not recall ever observing them in a "buckled" state.  (Smith Depo. at 22.)  She had never seen one pushed toward the door area.  (Id. at 22-23.)  She had never seen anyone trip on the mats, nor been informed of such an incident, other than in the present case.  (Id. at 23.)  Smith had never

4

Page | 4

personally repositioned the mats, but she had called upon the housemen to reposition them at points "throughout the day, if they were crooked, or . . . if somebody moved them, like a delivery man . . . ." (Id. at 23:17-19.) She had never observed the weather mats in a state where they were not completely level against the decorative carpet in the foyer. (Id. at 24.) She had never observed guests moving or fixing the mats in the foyer area. (Id.)

Smith testified that the hotel also has three weather mats in the lobby area near the front desk during "bad weather" months. (Smith Depo. at 37.) Smith recalled having seen guests reposition those mats and had done so herself upon noticing that it was "flipped up. If somebody scuffed it with their heel, and they didn't realize it." (Id. at 37:21-38:4.) Smith clarified that, by "scuffed up" she mean that the corner of the mat would get lifted. (Id. at 38.) She agreed that, if a mat in the lobby got "scuffed up," somebody could more easily trip over it "[i]f they [were] not paying attention." (Id. at 38:20-22.)

### 3. Dwayne Byes

Dwayne Byes is employed as a houseman at the Holiday Inn and worked first shift in October of 2018. (Byes Depo. at 8.) In that capacity he was responsible for cleaning the public areas of the hotel, including the lobby and the foyer. (Id. at 8-10.) His duties would include vacuuming the area, making sure the "rugs"[2] are "straightened out" or general tidying up. (Id. at 10:6-10.) Byes testified that the housemen had "[n]o set time" when they had to inspect the area, but they would "get out there as often as [they] could." (Id. at 14:8-12.) He estimated that

---

[2] It appears from context that Mr. Byes' reference to "rugs" indicates the weather mats in the foyer area, including the mat that is the subject of this lawsuit. (See Byes Depo. at 11-12.)

someone would "usually [be] out there at least maybe once an hour or something like that to check."  (Id. at 14:12-14.)

Byes testified that the weather mats in the foyer area are intended to prevent "slippage." (Byes Depo. at 12.)  He stated that they are normally "always straightened out" because "[s]omebody is always kind of tidying up out there."  (Id. at 12-13.)  This might be done by maintenance men or "[w]hoever walked through that works here, if they see the rugs messed up, they will straighten it out.  But more than likely, it's going to be housemen." (Id. at 13.)

Byes admitted that he had personally "straightened" the weather rugs during his shifts. He stated that "[s]ometimes they would be dirty" or "[m]aybe sometimes when people come and they wipe their feet, it may slide.  Not [flip] up, but slide. Then you put it back the way it's supposed to be. And you vacuum, and you mop along the outsides.  And put down a 'wet floor' sign." (Byes Depo. at 14:21-15:1.)  The frequency of these tasks would depend on factors like hotel occupancy and weather.  (Id. at 13.)  Sometimes Byes "would be there three or four times" in a shift; other times "not so much." (Id. at 13:16-17.)  Although he acknowledged that the weather rugs would sometimes "slide" or "shift," he denied ever seeing them buckled or lying in a position where they were not flat.  (Id. at 13, 15.)

    4.  <u>Stephen Windsor</u>

Stephen Windsor is the general manager of the Holiday Inn and was present at the hotel on October 17, 2018 when Carole Barrese tripped and fell.  He was new to his position at that point, having been on the job only for a few weeks. (Windsor Depo. at 13, 20.)  Because it was the hotel's slow season, he generally walked the grounds three times a day during his shifts.  (Id.

at 13-15.)  He testified that he did not typically find many problems during his walk-throughs, because the cleaning staff was "very on top of things."  (Id. at 15:7-8.)

During the course of his walk-throughs Windsor would typically check to make sure that the mats in the foyer area were "[l]aid flat, straight, and just over all tidy."  (Windsor Depo. at 21:12-13.)  Although Windsor did not independently recall inspecting the foyer area on the morning of October 17, 2018, he stated that it would have been part of his daily routine.  (Id. at 20.)  Windsor testified that he typically checked the grounds once in the morning, a second time around 11:00 a.m. and then a third time prior to the end of his shift.  (Id. at 15.)  He estimated that he would have checked the foyer area at least once or twice prior to the time that Carole tripped and fell, though he did not document his walk-throughs and had no record of his activities on the day in question.  (Id. at 14, 20-21.)

Windsor was on duty at the time of Carole's fall and learned of it when a front desk clerk named "Kristen" brought the incident to his attention.  (Windsor Depo. at 17.)  He then spoke to Carole Barrese and completed an incident report.  (Id. at 18-19.)  According to Windsor, Carole reported that "she had fallen, gotten her foot caught on the rug. And that . . . there had been like a roll or a bump in it to allow her foot to get stuck."  (Id. at 18:12-15.)  Carole also reported that she had landed on her knee, her shoulder had hit the sliding glass doors in the entranceway, and her glasses had been broken.  (Id. at 41-42.)

After speaking with Carole Barrese, Windsor asked Kristen if she had "noticed anything wrong out there, . . . [l]Like a rug messed up or anything like that."  (Windsor Depo. at 17:18-19.)  Kristen indicated that she had not.  (Id. at 17:24.)  Windsor did not specifically inquire whether Kristen had inspected the foyer area.  (Id. at 17-18.)

7

After completing an incident report and sending it to Scott's corporate office, Windsor checked the foyer area. (Windsor Depo. at 43.) He found that one of the sliding glass doors was "slightly eschew [sic]," but otherwise "everything looked good." (Id. at 43:12-16.) He observed that the mats were "crooked but flat," and described this as "just an appearance sort of thing." (Id. at 43:17-22.) Windsor did not know whether anyone else had laid the mats flat after Carole fell. (Id. at 43-44, 85.) He was aware that another guest had helped Carole up after she fell but did not know whether that guest might have fixed the mat. (Id. at 85.) He did not recall whether anyone else was lingering in the lobby area at the time he interviewed Carole. (Id. at 82.)

Windsor testified that the main purpose of the weather mats was to cover up the tile portions of the hotel foyer so that the floor wouldn't be slippery. (Windsor Depo. at 27.) He acknowledged having seen them buckling "on occasion," (id. at 30:11), and stated that the mats might move as a result of "somebody potentially dragging their feet [and] maybe kick[ing] the corner over." (Id. at 27:1-2.) Typically, patrons would fix the mats themselves but, the front desk staff was also instructed to "pay attention to those sort of things, either fix it themselves or grab somebody if they're busy." (Id. at 27:8-10; see id. at 84.) Asked whether he had ever personally witnessed someone trip on the weather rugs, Windsor testified:

> A. I have seen people, who were dragging their feet, kick up the edge of the rug and . . . start to stumble. But I have never seen anybody fall down and get injured in any way.
>
> Q. You said -- what were these people doing? They were --
>
> A. Possibly dragging their feet. What they do, they will hit the edge of it. Then they will kind of flip up a corner.
>
> Q. Are you certain that everybody that stumbled on them was dragging their feet, or is that just a possibility?
>
> A. That's just a possibility.

(Id. at 31:23-31:10.)

Windsor estimated that, on average, the mats in the foyer area might need to be repositioned two to three times a day. (Windsor Depo. at 70, 84.) He stated that, "[t]ypically, with the amount of staff here, someone walks past it." (Id. at 34:8-9.) He estimated that, if "something [is] not as it should be, it wouldn't be more than 15-20 minutes before somebody walked past it; other than that, the front desk is always there and always attentive to the condition of the lobby." (Id. at 34:9-13.) In addition, housemen are required to perform hourly checks of the area, although Windsor could not recall "what exactly the standards were" in October 2018. (Id. at 34:20-35:10.)

### 5. Carole Barrese

Carole Barrese testified that she arrived at the Holiday Inn sometime around 3:00 p.m. on October 17, 2018, intending to stay there with her husband for two nights. (C. Barrese Depo. at 23-25.) The Barreses traveled to the area on a regular basis in connection with Robert's employment, and they had stayed at the Holiday Inn "many times" before. (Id. at 24, 27.)

As she entered the hotel to retrieve a luggage carrier, Carole did not notice anything different about the layout or condition of the foyer/vestibule; she found the area to be "just how it's always been. Two rugs were there." (C. Barrese Depo. at 27:12-18.) On prior occasions she had noticed that the "rugs would move" and had "straightened them out." (Id. at 29:9-10.) She recalled one prior occasion when she noticed a rug "leaning up against the door." (Id. at 29:15). She didn't think anything of it" and "pulled it back . . . in place." (Id. at 29:14-16, 19). She had never made any complaints or reports to hotel staff about the rugs, but she concluded that the staff were "well aware" of the situation (id. at 30:3), as she had personally witnessed them straighten the rugs and put them back in position when they moved. (See id. at 29-31.)

Carole estimated that approximately thirty minutes passed between the time she initially entered the hotel on October 17, 2018 and the time she returned downstairs to the lobby.  (C.

Barrese Depo. at 27.)  Regarding the specifics of her fall, she testified as follows:

A.  I guess I'm really unclear exactly what happened.  I was standing.  I walked out.  I turned and put the cart back in position, and I turned to leave, and the next thing I knew I was on the ground.  It really happened very quickly.

Q.  Do you recall either of your feet making contact with anything before the time that you were on the ground?

A.  My foot got trapped under the rug.

Q.  Which foot?

A.  My left.

Q. And which part of your foot got trapped under the rug?

A. My toe part.

* * *

Q. Do you know whether the black rug was lifted in the -- as your toe came in contact with it?

A. I'm assuming that's exactly where I fell down.  It went into those little ridges.

Q.  Did you see a ridge in the black rug at any time before you made contact with the ground?

A. If I saw it, I wouldn't have fallen.

Q. Okay.

A. And it was there.  I didn't see it.  I didn't see it.

Q. Is it also possible though that your toe came into contact with the rug and lifted it up as your toe was going underneath it?

A. No.

* * *

Q. And if you believe no, what do you base that on?

* * *

A. . . . I walked on that rug a lot.  Why would my foot cause that rug - - I can't imagine how if it wasn't beveled my foot would have gone underneath it.

10

Q.  Can we agree that you did not actually see what you've described as a bevel in the rug before you were on the ground?

A. Correct.

Q.  So it is your assumption that it was there prior to you going on the ground?

A. Yes.

(C. Barrese Depo. at 32:3-34:13.)

After tripping and falling, Carole landed on her left knee.  Her head and shoulder hit the sliding glass door, knocking it off track and breaking her reading glasses in the process.  (C. Barrese Depo. at 34, 44-45.)  Carole acknowledged that she did not actually see the condition of the rug in the moments immediately before her fall.  (Id. at 36.)  On the photograph of the rug that she took the next day, she could not indicate where she believed her foot had gotten caught. (Id.)

   *C.  The Pending Motions*

On February 21, 2020, Defendant filed the pending motion for summary judgment and supporting materials.  See ECF Nos. 20-22.  Defendant argues that Plaintiffs cannot prove a dangerous condition caused Carole Barrese to trip.  Assuming that a dangerous condition did in fact cause Carole's fall, however, Defendant argues that there is no evidence to establish its actual or constructive knowledge of such condition.

Plaintiffs filed their responsive papers on March 20, 2020, ECF Nos. 23 and 24, and Defendant filed its reply on March 27, 2020.  See ECF Nos. 25 and 26.

Thereafter, Plaintiffs filed the pending motion for sanctions pursuant to Federal Rule of Civil Procedure 11.  ECF No. 27.  Plaintiffs contend that Defendant violated Rule 11 by filing a "frivolous" motion for summary judgment that "omitted highly relevant facts necessary for an accurate portrayal of the factual record."  ECF No. 27 at 1.  Plaintiffs further argue that

Defendant's motion "relied upon arguments and factual contentions not supported by existing law or record evidence."  Id. Defendant has filed its response to the Rule 11 motion, ECF No. 29, and Plaintiffs have filed their reply.  ECF No. 31.

Page | 12

As a result of the foregoing proceedings, both the Defendant's motion for summary judgment and the Plaintiffs' motion for sanctions are ripe for adjudication.  The Court will first address Defendants' motion for summary judgment.

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Catrett,* 477 U.S. at 323 (quoting Fed. R. Civ. P. 56).  After the moving party has satisfied this burden, the nonmoving party must provide facts showing that there is a genuine issue for trial in order to avoid summary judgment. *Id*. at 324.  The nonmoving party must go beyond the pleadings and show specific facts by affidavit or by information in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to

his claim. *Id*. at 322.  In conducting its analysis, the court must construe the record and any

reasonable inferences in the light most favorable to the party opposing summary judgment.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## III.    Discussion

Plaintiffs' complaint in this case sounds in negligence.  To establish a claim of

negligence under Pennsylvania law, a plaintiff must show that (1) the defendant had a duty to act

in conformity with a standard of conduct, (2) the defendant breached that duty, (3) the plaintiff

suffered harm, and (4) that breach was the cause of the plaintiff's harm.  *Krentz v. Consol. Rail*

*Corp*., 910 A.2d 20, 27 (Pa. 2006).

In cases of premises liability, "[t]he standard of care a possessor of land owes to one who

enter upon the land depends upon whether the person entering is a trespasser, licensee, or

invitee." *Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983) (citation omitted).  There is no

dispute in this case that Carole Barrese was a business invitee on Defendant's premises at the

time she fell and sustained her injuries.  The Pennsylvania Supreme Court has explained that:

> [p]ossessors of land owe a duty to protect invitees from foreseeable harm. With
> respect to conditions on the land which are known to or discoverable by the
> possessor, the possessor is subject to liability only if he,
>
>   (a) knows or by the exercise of reasonable care would discover the condition, and
>   should realize that it involves an unreasonable risk of harm to such invitee, and
>
>   (b) should expect that they will not discover or realize the danger, or will fail to
>   protect themselves against it, and
>
>   (c) fails to exercise reasonable care to protect them against the danger.

*Id.* (citing Restatement (Second) of Torts §343 (1965)); *see Fristic v. Maple Lawn Assocs., Inc*.,

No. 858 MDA 2019, 2020 WL 4728115, at *3–4 (Pa. Super. Ct. Aug. 14, 2020).

13

In construing this portion of the Restatement, Pennsylvania courts have uniformly held that if the harmful transitory condition is traceable to the possessor or his agent's acts, (that is, a condition created by the possessor or those under his authority), then the plaintiff need not prove any notice in order to hold the possessor accountable for the resulting harm. . . . In a related context, where the condition is one which the owner knows has frequently recurred, the jury may properly find that the owner had actual notice of the condition, thereby obviating additional proof by the invitee that the owner had constructive notice of it. . . .  Where, however, the evidence indicates that the transitory condition is traceable to persons other than those for whom the owner is, strictly speaking, ordinarily accountable, the jury may not consider the owner's ultimate liability in the absence of other evidence which tends to prove that the owner had actual notice of the condition or that the condition existed for such a length of time that in the exercise of reasonable care the owner should have known of it. . . .

*Moultrey v. Great A & P Tea Co.*, 422 A.2d 593, 596 (Pa. Super. Ct. 1980) (internal citations omitted).

While both Plaintiffs and Defendant agree on the foregoing legal standards, they disagree as to whether sufficient evidence exists to support a finding that: (a) Scott's had notice of a hazardous condition, and (b) such condition proximately caused Plaintiff's injuries.  We address these issues below in reverse order.

A.   *There is Insufficient Evidence in the Record to Establish that a Dangerous Condition Caused Carole Barrese's Trip and Fall.*

Defendant first argues that it is entitled to judgment because there is no evidence to establish that a dangerous condition at the hotel caused Carole Barrese to fall and injure herself. None of the witnesses in this case -- including Carole -- observed the condition of the mat in the moments before her fall.  Defendant posits that it is possible the mat was lying flat at the moment Carole's toe first impacted it and that Carole may have disrupted the mat herself.  Defendant further posits that Plaintiffs' theory as to causation is founded entirely upon Carole's own assumptions about how and why she fell, but her assumptions are not evidence.  Having

carefully reviewed all of the evidence in the record, the Court finds Defendant's position to be well-taken.

"With respect to dangerous conditions under Pennsylvania law, a landowner can only be subject to liability for physical harm if the harm is caused by the landowner's negligence concerning that condition." *Butts v. Weisz*, No. 07-1657, 2010 WL 703238, at *5 (W.D. Pa. Feb. 25, 2010), *aff'd*, 410 F. App'x 470 (3d Cir. 2010). "Negligent conduct is said to be a legal cause if it is a substantial factor in bringing about the injury." *Id*.  A court may not submit the issue of causation to the jury "if it would require guessing or speculation to determine cause." *Stagnaro v. Target Corp.*, No. CV 16-3535, 2019 WL 1934871, at *11 (E.D. Pa. May 1, 2019), *appeal dismissed*, No. 19-2266, 2019 WL 6505830 (3d Cir. July 8, 2019) (citing *Newton v. Norfolk S. Corp.*, No. 05-01465, 2008 WL 55997, at *5 (W.D. Pa. Jan. 3, 2008) (internal quotation marks omitted).  "[I]t is not necessary that plaintiff prove with mathematical exactness that the accident could only have been caused in one manner to the exclusion of all other possibilities, but he must eliminate those other causes, if any, as were fairly suggested by the evidence" *Butts*, 410 F. App'x at 472 (citing *Cuthbert v. City of Phila.*, 209 A.2d 261, 263–64 (Pa. 1965)).  "In keeping with these principles, courts have consistently granted summary judgment where plaintiffs provided insufficient evidence of factual causation for a jury to reach a verdict without guesswork." *Stagnaro*, 2019 WL 1934871, at *12 (citing cases).

In this case, the only witness to the circumstances of Carole Barrese's fall was Mrs. Barrese herself.  Even so, she admitted that she was "really unclear [about] exactly what happened."  (C. Barrese Depo. at 32:3-4.)  Carole recalled only that "[she] was standing. [She] walked out. [She] turned and put the cart back in position, and . . . turned to leave, and the next thing [she] knew [she] was on the ground.  It really happened very quickly."  (Id. at 32:4-7.)

Though she claimed that her left toe got trapped under the mat, she admitted that she did not see any of "ridges" or any "beveled" area where she claims her toe made contact.  (Id. at 32:11-33:15, 34:7-10.)  Upon further questioning she admitted that she could only "assume" that an area of the mat had been "lifted" or "beveled" when she encountered it.  (Id. at 32:23-33:2, 34:11-13.)  She was clear about the fact that she did not see the condition of the mat in the moments preceding her fall.  (Id. at 35:4-7.)  Further, when shown a photograph of the mat during her deposition, she could not identify the portion of the mat with which her toe had made contact, as she was "on the ground" and "didn't see where [her] foot was."  (Id. at 44:15-19.)

As Defendant points out, Carole's assumption about the condition of the mat is not competent evidence for purposes of establishing causation.  There is no evidence establishing that the subject mat was, in fact, buckled or "beveled" at the moment Carole Barrese encountered it, and the fact that she observed the mat to be buckled on the day following her accident is not instructive, given the transient nature of the alleged hazardous condition.  Furthermore, Carole's testimony does not preclude the reasonable possibility that the mat had been lying flat and that she disrupted the mat herself when she encountered it.  In fact, Windsor testified that he inspected the foyer area after interviewing Carole Barrese and found the mats to be "crooked but flat."  (Windsor Depo. at 43:19.)  Because the record before the Court would require a factfinder to speculate about the cause of Carole's injuries, her negligence claim cannot survive summary judgment.  *See Hartigan v. Clark,* 165 A.2d 647, 653 (Pa. 1960) (ruling in favor of defendant in premises liability case involving allegedly hazardous stair, where the plaintiff's description of a hazardous condition that existed 24 hours after the accident "may or may not have existed when plaintiff fell"); *see also Cuthbert v. City of Phila.*, 209 A.2d 261, 264 (Pa. 1965) (finding insufficient evidence of factual causation where a plaintiff who tripped over a trolley rail could

16

Page | 16

not identify the exact portion of the crosswalk she was on when she fell or where her feet were located at the time of her fall; court noted that, while the plaintiff "may very well have fallen into the defect as she alleged," it was "equally possible that she tripped over a properly maintained section of the trolley rail for which, while unfortunate, no liability would have attached").

B. *There is Insufficient Evidence to Establish that the Defendant Had Notice of a Dangerous Condition as to Which it Failed to Exercise Reasonable Care.*

Assuming Plaintiffs could establish that a hazardous condition proximately caused Carole Barrese's injury, Defendant nevertheless argues that there is insufficient evidence to show that it had either actual or constructive notice of the dangerous condition. The Court agrees that the evidence is insufficient to establish that Defendant had notice of a dangerous condition as to which it failed to exercise reasonable care.

Courts in this Commonwealth recognize that the "mere existence of a harmful condition in a public place of business, or the mere happening of an accident due to such a condition is neither, in and of itself, evidence of a breach of the proprietor's duty of care to his invitees, nor raises a presumption of negligence." *Myers v. Penn Traffic Co.*, 606 A.2d 926, 928 (Pa. Super. Ct.1992) (en banc). Instead, an invitee must present evidence proving "either the proprietor of the land had a hand in creating the harmful condition, or he had actual or constructive notice of such condition.'" *Estate of Swift v. Northeastern Hosp. of Phila.*, 690 A.2d 719, 722 (Pa. Super. Ct. 1997)); *see Moultrey*, 422 A.2d at 598.

"What constitutes constructive notice depends on the circumstances of the case, but one of the most important factors to consider is the time that elapsed between the origin of the condition and the accident." *Magaskie v. Wawa, Inc*., No. 424 EDA 2015, 2015 WL 8484697, at *2 (Pa. Super. Ct. Dec. 10, 2015) (quoting *Neve v. Insalaco's*, 771 A.2d 786, 791 (Pa. Super. Ct.

17

2001)) (internal quotation marks omitted).  Constructive notice will exist when "the condition existed for such a length of time that in the exercise of reasonable care the owner should have known of it." *Moultrey,* 422 A.2d at 596.  "This length of time varies with the circumstances." *Larkin v. Super Fresh Food Markets, Inc*. 291 F. App'x 483, 485 (3d Cir. 2008) (citing *Neve*, 771 A.2d at 791).  Critically, however, "courts commonly treat a plaintiff's failure to provide evidence of timing as dispositive."  *Id*. (citing, *Lanni v. Pa. R.R. Co.,* 88 A.2d 887, 888 (Pa. 1952) (reversing the denial of defendant's motion for judgment notwithstanding verdict where the plaintiff slipped on a grease spot but "*there was no evidence [showing] how long it had been on the driveway* ")(emphasis in the original); *Porro v. Century III Assocs.,* 846 A.2d 1282, 1286 (Pa. Super. Ct. 2004) (affirming summary judgment because the defendant "admitted in his deposition he does not know how long the substance he slipped on was present"); *Estate of Swift,*, 690 A.2d at 722 (affirming summary judgment because the defendant did not present evidence regarding "how long the condition existed").

Insofar as the "hazardous condition" in this case is narrowly defined as the alleged buckling of the weather mat *at the moment Plaintiff encountered it,* Defendant accurately observes that there is insufficient evidence of either actual or constructive notice.  Nothing in the record suggests that the hotel staff members were actually aware that the subject mat was in a hazardous state during the time frame when Plaintiff fell.  Moreover, Plaintiffs have adduced no evidence as to how long this alleged unsafe condition may have persisted prior to Carole's fall. Viewed in this light, the Defendant is entitled to summary judgment because Plaintiffs cannot establish that Defendant's agents had notice of the alleged dangerous condition and yet failed to take reasonable measures to protect the hotel's invitees.

18

Plaintiffs frame the notice issue slightly differently, however.  They define the hazardous condition more broadly as an alleged tendency for the subject weather mats to frequently buckle.  Plaintiffs claim that Scott's had actual notice of this dangerous condition and, in fact, created it.

Page | 19

As recited above, "if the harmful transitory condition is traceable to the possessor or his agent's acts, (that is, a condition created by the possessor or those under his authority), then the plaintiff need not prove any notice in order to hold the possessor accountable for the resulting harm." *Moultrey,* 422 A.2d at 596; *See also Gumby v. Prime*, No. 1030 MDA 2019, 2019 WL 7291061, at *4 (Pa. Super. Ct. Dec. 30, 2019) (citing *Myers v. Penn Traffic Co*., 606 A.2d 926, 929 (Pa. Super. 1992) (*en banc*)).  In this case, however, there is no evidence to suggest that any agent of Scott's created the alleged harmful transitory condition (i.e., the alleged buckling of the weather mat).  Moreover, to the extent Plaintiffs are claiming that the very presence of the weather mats in the hotel entranceway was the "hazardous condition," their theory is untenable.  There is no allegation or evidence to suggest that any particular property of the subject mat was unsafe, and Plaintiffs have not pointed to evidence showing that the location of the mats, when lying flat in their intended position, created an unsafe condition for persons traversing the hotel entrance.  On the contrary, the evidence indicates that the mats were placed in the foyer area to absorb moisture and prevent the floor surface from becoming slippery.  (*See* Byes Depo at 12.)  Although the mats were not affixed to the floor, this too served a safety purpose in that it allowed the mats to be removed for regular cleaning and replacement.  (See Sotter Depo. at 20-21; see also ECF No. 22-3 at 3.)

Plaintiffs' primary argument, it appears, is that hotel staff were aware that the mats in the foyer area "frequently buckled" and, thus, the Defendant had actual notice of a recurring hazardous condition that ultimately caused Carole to fall and injure herself.  Under Pennsylvania

19

law, "[w]here the [harmful transitory] condition is one which the [premises] owner knows has frequently recurred, the jury may properly find that the owner had actual notice of the condition." *Moultrey*, 422 A.2d at 596.

Having fully reviewed the entirety of the summary judgment record, the Court concludes that Plaintiffs' argument somewhat overstates the alleged frequency of the mats' "buckling" and the hotel staff's notice thereof by conflating testimony about the mats' movement with their tendency to "bunch up," "bevel," or "buckle."[3]  Houseman Byes acknowledged, for example, that the mats could sometimes shift and slide from people wiping their feet, but he denied ever seeing the foyer mats buckled or otherwise not level with the floor.  Smith testified that she had never observed the mats in the hotel foyer area to be buckled or unlevel; she testified only that she had seen mats in the lobby area get "kicked up" if someone "scuffed it with their heel." (Smith Depo. at 38.).   Though Sotter acknowledged that the foyer mats could get "bunched up," her testimony does not indicate how frequently she observed the mats in this condition. Similarly, Windsor's testimony that the mats became buckled "on occasion" does not necessarily reflect a "frequently" recurring condition.  And, although Windsor testified that the foyer mats were repositioned two or three times a day, his testimony does not distinguish between readjustment of the mats for cosmetic purposes versus the remediation of a potential hazard.

In any event, however, even if the buckling of the weather mats in the hotel foyer was a hazardous condition that "frequently recurred," the evidence in this case is insufficient to support a finding that Defendant breached its duty of care.   Under Section 343 of the Restatement, a possessor of land is liable for the physical harm to its invitees only if the possessor "fails to

---

[3] The Court construes the use of these terms to be synonymous.

20

exercise reasonable care to protect them against the danger." *See Moultrey*, 422 A.2d at 596 (quoting the Restatement (2d) of Torts, §343).  Here, the undisputed evidence shows that Defendant had protocols in place to address the allegedly hazardous condition.  The mats in the foyer area were regularly cleaned and replaced by a third party vendor.   Sotter walked the hotel grounds five days a week as part of her regular inspections.  Windsor also conducted daily inspections of the hotel grounds, including the foyer.  The housemen inspected the hotel's common areas, including the foyer, multiple times throughout the day and as called upon by front desk clerks or other hotel staff.  According to Windsor, hotel staff members regularly passed through the foyer area and would generally notice and address any problems within a 15 to 20 minute timespan.  In light of these uncontradicted facts, no jury could reasonably conclude that the Defendant failed to exercise reasonable care to protect its business invitees from the hazardous condition that allegedly harmed Plaintiff in this case.

The instant case is therefore distinguishable from *Mills v. United States*, Civil Action No. 18-4034, 2019 WL 4546931 (E.D. Pa. Sept. 19, 2019), on which Plaintiffs rely for their argument that genuinely disputed issues of fact preclude summary judgment in this case.  In *Mills*, the plaintiff sustained injuries after tripping on a post office rug. She presented evidence that the rug frequently became uneven, which the defendant's employee affirmatively acknowledged to be a danger.  The district court denied the defendant's summary judgment motion, concluding -- in relevant part -- that the evidence could support a finding that the defendant had not exercised reasonable care to protect the plaintiff from the danger presented by the subject rug.  See id. at *3 ("The Court is not convinced that the custodian's daily exercise of his judgment about whether and how to lay out the mats demonstrates that the Government exercised reasonable care so as to defeat summary judgment.").  Here, unlike in *Mills,* the

21

Defendant has produced unrebutted evidence that it took substantial, reasonable measures to remediate any hazards that the mats in the foyer area might pose to the Defendant's business invitees.  *Mills,* therefore, does not guide the outcome of this case.

Page | 22

In their opposing brief, Plaintiffs make much of the fact that the Defendant could not produce any records documenting the housemen's cleaning and maintenance of the foyer area as it relates to the time period surrounding Plaintiff's fall.  But the absence of these records does not demonstrate, as Plaintiffs suggest, that hotel staff failed to exercise reasonable care relative to any hazards posed by the weather mats in the foyer area.  Rather, the uncontested evidence establishes that hotel staff were not aware of a corporate policy requiring such documentation until Sotter attended a management training session in April 2019 -- several months after Plaintiff's fall.  After attending the April 2019 training session, Sotter implemented the policy requiring housemen to document their cleaning activities.  (See Sotter Depo. at 23-24, 27-29, 45; Windsor Depo. at 51-53, 58.)  Regardless of the documentation or lack thereof, however, Windsor testified that the housemen performed the same general tasks after April 2019 as they had previously performed before; the only change was the paperwork.  (Windsor Depo. at 83-84.)  Under these circumstances, the absence of records documenting the housemen's activities on the day of Plaintiff's fall is not probative as to whether those activities occurred.

*C.  Res Ipsa Loquitor Does Not Apply*

As an alternative basis for proving their negligence claims, Plaintiffs invoke the evidentiary rule of *res ipsa loquitor.  See Cox v. Wal-Mart Stores E., L.P*., 350 F. App'x 741, 744 (3d Cir. 2009) ("Pennsylvania 'has adopted the evidentiary rule of *res ipsa loquitur* as articulated in the Restatement (Second) of Torts.'") (quoting *D'Ardenne v. Strawbridge & Clothier, Inc*., 712 A.2d 318, 321 (Pa. Super. Ct. 1998)).  Pursuant to Section 328D(1) of the Restatement, "[i]t

22

may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff."  Restatement (Second) of Torts § 328D(1).

Importantly, when "a patron suffers injury in a store from a transitory danger, *res ipsa loquitur* does not apply." *Neve*, 771 A.2d at 790. The doctrine may be applied to a "defect in the building or its fixtures," which exists "for sufficient time to charge the defendant store with knowledge," *id.*, but it does not apply to a "transitory defect like a spill," *id.* at 791, because "shopkeepers cannot be charged with notice of transitory dangers that can materialize a split second before an injury occurs." *Id.* at 790.  In this case, the transient nature of a buckled or "beveled" weather mat precludes application of *res ipsa loquitor*.

In addition, based upon the evidence in this case, Plaintiffs cannot eliminate other potentially responsible causes for the alleged hazardous condition, including the conduct of the Carole Barrese herself or other third parties.  As discussed, the record here would permit a reasonable inference that Carole Barrese disturbed the (otherwise level) mat at the moment she encountered it.  Alternatively, the evidence would permit an inference that third parties -- such as delivery personnel or other hotel guests -- may have disrupted the mat, causing it to perhaps flip or buckle shortly before Carole came into contact with it.  *See, e.g., Lonsdale v. Joseph Horne Co.*, 587 A.2d 810, 816 (Pa. Super. Ct. 1991) (affirming judgment for defendant where the plaintiff failed to produce evidence that would have eliminated third parties, such as other store patrons, as possible causes of the accident).

23

*D. Summary*

In sum, based upon the evidence before the Court, Plaintiffs cannot establish that the Defendant caused, or had notice of, a hazardous condition that proximately caused Carole Barrese's injuries.  To the extent that Plaintiffs have demonstrated Defendant's actual awareness of a recurrent, transient hazard, Plaintiffs cannot show that Defendant failed to exercise reasonable care to protect its business invitees.  As a result, Carole Barrese's negligence claim fails as a matter of law.  Inasmuch as Robert Barrese's loss-of-consortium claim is derivative of Carole's negligence claim, Robert's claim necessarily fails as well.

## IV.    Plaintiff's Motion for Sanctions

The Court now turns briefly to Plaintiffs' motion for sanctions, which is asserted pursuant to Rule 11(c) of the Federal Rules of Civil Procedure.  Rule 11 provides that a party may be sanctioned if, inter alia, a motion is "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  See Fed. R. Civ. P. 11(b)(1) and (c).  In considering a motion for sanctions under Rule 11, "[a] district court must determine whether the attorney's conduct was objectively reasonable under the circumstances."  *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 297 (3d Cir. 2010) (internal quotation marks omitted).  The court should impose sanctions "only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Id*.

Given the Court's favorable disposition of Defendant's motion for summary judgment, there are plainly no grounds for imposing sanctions against the Defendant pursuant to Rule 11. Accordingly, the Plaintiffs' motion for Rule 11 sanctions will be denied.

Page | 24

## V.    Conclusion

Based upon the foregoing reasons, the Defendant's motion for summary judgment will be granted and the Plaintiffs' counter-motion for sanctions will be denied.

An appropriate Order follows.

Susan Paradise Baxter
United States District Judge